IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARLENE J. GARNER,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>　　　　　Defendant. | Case No.: 1:10-cv-01151 JLT<br><br>ORDER DIRECTING THE ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF DARLENE J. GARNER |

Darlene Garner ("Plaintiff") asserts she is entitled to benefits under Titles II and XVI of the Social Security Act. Plaintiff asserts the administrative law judge ("ALJ") erred in finding her discoid lupus did not meet or equal a listed impairment and erred in assessing the credibility of her subjective complaints. In addition, Plaintiff asserts the ALJ failed to consider a third-party statement provided by her husband. Therefore, Plaintiff seeks judicial review of the administrative decision denying her claim for benefits. For the reasons set forth below, the Court **AFFIRMS.**

### PROCEDURAL HISTORY[1]

Plaintiff filed applications for disability insurance benefits and supplemental security income on January 25, 2006, alleging disability beginning April 24, 2002. AR at 118, 123. The Social Security Administration denied her claims initially on July 12, 2006, and upon reconsideration on

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

1  December 19, 2006. *Id.* at 58- 80.  After requesting a hearing, Plaintiff testified before an ALJ on
2  October 9, 2007.  *Id.* at 16.
3        The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an
4  order denying benefits on January 18, 2008.  AR at 9-15.  Plaintiff requested a review by the Social
5  Security Appeals Council, which denied review of the ALJ's decision on June 5, 1009.  *Id.* at 1-3.
6  Therefore, the ALJ's determination became the decision of the Commissioner of Social Security
7  ("Commissioner").

## STANDARD OF REVIEW

9        District courts have a limited scope of judicial review for disability claims after a decision by
10  the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,
11  such as whether a claimant was disabled, the Court must determine whether the Commissioner's
12  decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The
13  ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal
14  standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y*
15  *of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).
16        Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a
17  reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S.
18  389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).  The record as a whole
19  must be considered, as "[t]he court must consider both evidence that supports and evidence that
20  detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

22        To qualify for benefits under Titles II and XVI of the Social Security Act, Plaintiff must
23  establish she is unable to engage in substantial gainful activity due to a medically determinable
24  physical or mental impairment that has lasted or can be expected to last for a continuous period of
25  not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a
26  disability only if:
27      physical or mental impairment or impairments are of such severity that he is not only
    unable to do his previous work, but cannot, considering his age, education, and work
28      experience, engage in any other kind of substantial gainful work which exists in the

national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2010). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 416.927, 416.929.

A.   Relevant Medical Evidence

On April 22, 2002, Dr. Sunit Patel noted Plaintiff had been diagnosed with lupus. AR at 212. At the time, Plaintiff was admitted at Mercy Medical Center Merced for complaints of "extreme weakness and fatigue," chest pain, and a cough. AR at 214. Plaintiff was diagnosed with "hyponatremia, hypochloremia and a large effusion that takes up about 2/3 of the mass of her right lung with what look[ed] like a bleb or abscess developing in the upper third of it." *Id.* at 215. Dr. Jaipal Reddy examined Plaintiff and noted she had shortness of breath and hoarseness of her voice. *Id.* at 200. In addition, a CT study of Plaintiff's chest revealed a "large loculated hydropneumothorax" which indicated possible empyema. *Id.* at 200, 204. Plaintiff was transferred to Doctors Hospital of Manteca on April 25, 2002. *Id.* at 290. A chest x-ray revealed an abscess in her right lung. *Id.* at 288. A video-assisted thoracic surgery to drain her lung and biopsy of her right lower lobe resulted in a diagnosis of "benign pulmonary tissue with organizing interstitial

pneumonitis, fibrosis, atelectasis, and hemorrhage." *Id.* at 274, 282. Plaintiff was discharged and was placed on a Heimlich valve to drain fluids on May 2, 2002. *Id.* at 228.

Dr. Teresita Enad began to treat Plaintiff on September 24, 2004, at which time Dr. Enad noted Plaintiff had lupus. AR at 317; *see also id.* at 294-320. While being treated by Dr. Enad, Plaintiff consulted several specialists regarding various health issues. *Id.* On October 4, 2004, she saw Dr. Yasmeen Khalid for evaluation and treatment of her systemic lupus erythmatosus. *Id.* at 353. Plaintiff complained of "excessive fatigue and chronic depression due to a poor quality of life," as well as "shortness of breath and dyspnea on exertion." *Id.* Dr. Khalid recommended Plaintiff see a pulmonologist for evaluation of emphysema. *Id.* at 354.

Dr. Rama Nandipati treated Plaintiff for her complaints of shortness of breath on October 20, 2004. *Id.* at 307-08. Dr. Nandipati noted Plaintiff smoked a pack of cigarettes a day, and reported "shortness of breath is worse with any exertion." *Id.* at 307. Dr. Nandipati opined Plaintiff suffered from a chronic obstructive airway disease, depression, and systemic lupus. *Id.* at 308. On November 10, 2004, Dr. Nandipati administered a pulmonary function test on Plaintiff, which led to the conclusion that Plaintiff suffered from a "moderately severe obstructive airway disease, predominantly emphysematous type." *Id.* at 304.

Dr. Frank Berry, a dermatologist, saw Plaintiff on referral from Dr. Khalid for treatment of skin problems stemming from lupus and alopecia on November 2, 2005. *Id.* at 323-31. Dr. Berry noted Plaintiff's lesions worsened upon exposure to sun. *Id.* In December, Dr. Berry performed biopsies of Plaintiff's scalp and shoulder, and found "changes consistent with lupus." *Id.* at 327-28. In addition, Dr. Berry found, "The changes in the scalp lesion favor discoid lupus whereas the changes in the shoulder somewhat suggest subacute cutaneous lupus." *Id.* at 328. Therefore, Dr. Berry recommended clinical correlation. *Id.*

On January 16, 2006, Plaintiff underwent a pulmonary function test which revealed moderately severe obstructive airway disease. AR at 334. In addition, Dr. Khalid referred her to Drs. Rauf and Javaid, who conducted a bone mineral study on January 25, 2006. *Id.* at 342. The test results indicated Plaintiff's bone density of her femoral neck and lumbar spine was normal. *Id.*

Dr. James Scaramozzino conducted a comprehensive psychiatric evaluation of Plaintiff on May 27, 2006. *Id.* at 355-59. Dr. Scaramozzino observed: Plaintiff's "behavior was cooperative" and "[h]er attitude was hopeful." *Id.* at 357. In addition, he noted:

> Stream of Mental Activity/ Speech: Stream of mental activity was within normal limits. Speech form logical, coherent, concise. Articulation quality was clear. Velocity was normal. Volume was normal.
>
> Content of Thought: Thought content was appropriate. There was no indication[] of hallucinations or delusions.
>
> Mood/Affect: Mood was anxious. Affect was within normal limits. Sleep and appetite were within normal limits. The claimant denied current suicide ideations.

*Id.* (emphasis omitted). Dr. Scaramozzino found Plaintiff's calculation ability was good and her concentration, judgment and insight were within normal limits. *Id.* at 357-58. Dr. Scaramozzino determined Plaintiff had a GAF score of 65.[2] *Id.* at 358. He opined that Plaintiff was capable of managing her own funds and that her ability to remember instructions and maintain attention and concentration was good. *Id.* at 358-59. Nevertheless, Dr. Scaramozzino believed Plaintiff's ability to complete a normal workday and workweek was "poor due to her medical conditions," and the "[l]ikelihood of [her] emotionally deteriorating in a work environment is fair to high due to her high expectations for herself and her limitations related to her physical constraints." *Id.* at 359.

On June 10, 2006, Dr. James Nowlan conducted a comprehensive internal medicine evaluation of Plaintiff. AR at 360-63. Plaintiff reported that she had quit smoking, and had shortness of breath after walking thirty feet. *Id.* at 360. Dr. Nowlan found her motor strength was 5/5, and her reflexes were normal. *Id.* at 362. Dr. Nowlan opined: "I feel this claimant could stand and walk eight hours in an eight-hour day. . . Sitting would be unlimited. She required no assistive devices. The amount of weight she could lift frequently would be 15 pounds, occasionally 30 pounds." *Id.* at 362. In addition, he did not believe Plaintiff had any postural or manipulative limitations. *Id.* at 363. Dr. Nowlan stated it was "easy to see why she does not want to appear in

---

[2] GAF (global assessment functioning) scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

5

1 public" due to a "rather ugly disfigurement of her face and other areas of her body." *Id.* He believed
2 "she needs adequate treatment of her skin disease" to improve her appearance as well as alleviate her
3 depression and desire to avoid public exposure. *Id.*

4     Dr. Keith Quint completed a physical residual function capacity assessment of Plaintiff on
5 June 16, 2006. AR at 364-68. Dr. Quint believed Plaintiff could lift and carry twenty pounds
6 occasionally and ten pounds frequently. *Id.* at 365. Plaintiff could sit, stand, or walk for about six
7 hours in an eight-hour workday. *Id.* Plaintiff had no manipulative limitations, and an unlimited
8 ability to push and pull. *Id.* at 365-66. However, Plaintiff needed to avoid climbing frequently and
9 balancing occasionally due to her chronic obstructive pulmonary disease ("COPD"). *Id.* at 366. Dr.
10 Quint believed Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor
11 ventilation, machinery, heights, and other hazards. *Id.* at 367. Dr. Quint noted that objective
12 findings did not support that Plaintiff suffers from symptoms to the extent alleged. *Id.* at 368.
13 Therefore, Dr. Quint opined that a light[3] residual functional capacity was appropriate, within
14 limitations included for her COPD. *Id.*

15     On July 7, 2006, Dr. Martin Koretzky completed a psychiatric review technique on Plaintiff.
16 *Id.* at 372-86. He believed Plaintiff's mental impairment was not severe, and that she suffered from
17 an adjustment disorder with anxiety. *Id.* at 377. Dr. Koretzky believed Plaintiff did not have any
18 restrictions in activities of daily living, or difficulty in maintaining concentration, persistence, or
19 pace. *Id.* at 382. However, Plaintiff had mild difficulties in maintaining social functioning. *Id.* Dr.
20 Koretzky based his opinion, in part, on the following:

21 > Stream of mental activity, speech and thought content were [within normal limits].
> Mood was anxious and affect was [within normal limits]. She was oriented x 3 with
22 > average intelligence, intact memory, good calculation ability, and [within normal limits]
> concentration, abstracting and differentiating ability and judgment/insight.
23

24 *Id.* at 386. Overall, Dr. Koretzky believed the medical file documented "a mental impairment due to
25 [an] adjustment disorder with anxiety that currently is non-severe." *Id.*

26
27
28     [3] Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); 1983 SSR LEXIS 30.

6

Dr. Richard Betcher reviewed the objective evidence regarding Plaintiff and agreed with the assessment that her psychiatric disorder was non-severe on December 19, 2006. AR at 387-88. In addition, Dr. Betcher affirmed the opinion that she was capable of light work. *Id.* at 388.

On August 14, 2007, Dr. Kavi Kumar confirmed Plaintiff's diagnosis of COPD. AR at 390. Dr. Kumar instructed Plaintiff to stop smoking and prescribed Spiriva. *Id.*

B.  Plaintiff's Hearing Testimony

On October 9, 2007, Plaintiff testified before an ALJ, at which time she was fifty-one years old. AR at 20. Plaintiff stated she was married and lived with her husband, her fifteen-year-old son, and two dogs. *Id.* at 20-21. Her husband had "just started a training program in trucking," and was on the road. *Id.* at 20. Plaintiff reported she had a California driver's license and drove "maybe two days" each week to get groceries. *Id.* at 22.

Plaintiff testified she completed high school and one year of junior college. *Id.* at 23. In addition, she was certified by Cal Trade in Modesto for welding and "with stick," and worked doing mig welding for a steel building manufacturer for seven years. *Id.* Plaintiff stated she apprenticed as a plumber for eleven years, but had not become a journeyman. *Id.* at 23-24. Plaintiff estimated the heaviest thing she would lift on her own were pipes that weighed about 80-100 pounds. *Id.* at 25.

Plaintiff stated she was laid off from her work as a plumber in 2002 when her physical problems began. AR at 24, 26. She testified Dr. Merced prescribed antibiotics to treat laryngitis, but she did not have laryngitis and her physical problems worsened. *Id.* She reported her breathing problems started as hoarseness she was admitted to Merced Community Medical Center for four days but released without a diagnosis. *Id.* at 27-28. Plaintiff testified she was later diagnosed with a condition that filled her lung with liquids, but could not remember the name. *Id.* at 28. Plaintiff said shortness of breath precluded her from working a full time job because no employer wanted to hire someone that had to sit down. *Id.* at 26. In addition, Plaintiff believed that the condition caused her to pass out while driving, and caused a car accident in 2006. *Id.* at 30.

According to Plaintiff, Dr. Nandipati prescribed medication such as Advair and Spiriva to treat her shortness of breath. AR at 28. Plaintiff reported that initially she used inhalers once a week, but around October 2006 began to use them daily. *Id.* at 28-29. She claimed she suffered

7

shortness of breath "with or without" exertion. *Id.* at 29. Plaintiff said that, once she lost her breath, it took "about a half hour" for her to breathe normally; she had to use her inhaler and either sit or lay down for an hour. *Id.* at 30-31. Plaintiff reported she used inhalers at least two, but up to five, times each day. *Id.* at 32. According to Plaintiff, she had two pulmonary function tests, with the most recent one being with Dr. Kumar a couple months before the hearing. *Id.* at 33.

Plaintiff testified she was diagnosed with lupus in 2006, which attacked her skin, bowels, urinary tract, and hair. AR at 27, 37. Plaintiff reported she suffered from chronic diarrhea that started six months before the hearing, and she took anti-diarrheal medication each day, which she said "controls the diarrhea pretty much, as it can." *Id.* at 42-43. In addition, Plaintiff said that she used Depends adult diapers to help with the symptoms. *Id.* at 43. Plaintiff reported she had to "run" to the bathroom about two times a day before the medicine began to work, and she would go "two days, at the most" without suffering from diarrhea. *Id.* at 46-47.

She reported the lupus caused her hair loss as well as sores and blood blisters on her skin. *Id.* at 36-37. Plaintiff said sores were on her scalp, face, and arms, and she believed them to be permanent. *Id.* Plaintiff testified the sores were painful, and caused sensitivity to the sun that required her to wear sunglasses and a hat. *Id.* Also, Plaintiff testified the lupus had "gotten inside [her] ear" and caused pain. *Id.* at 40. She reported she had a topical treatment for her skin that she used "sparingly" because Medi-Cal did not cover it. *Id.* Though Plaintiff had a prescription for Plaquenil, she "couldn't keep it down" and stopped taking it in 2005. *Id.* at 41. Plaintiff said she "sometimes" took naproxen, an over-the-counter medication, which could temporarily and completely alleviate her pain. *Id.*

In addition to her shortness of breath and lupus, Plaintiff reported that she suffered from depression, which Dr. Khalid and Dr. Enad treated. AR at 27, 48. Plaintiff testified depression made her feel "like [not] doing anything, cooking dinner or nothing." *Id.* at 49. Plaintiff said she attempted suicide several times, with the most recent attempt a year and a half before the hearing. *Id.* She reported she took Zoloft beginning in 2004, and that it controlled her depression. *Id.* at 48, 50. Plaintiff believed depression did not affect her ability to function when taking Zoloft. *Id.*

8

1  Plaintiff testified the suicide attempts and "low time[s]" came when she was not taking the
2  medication. *Id.* at 50.
3       Plaintiff testified on an average day she lay on her bed and watched about fourteen hours of
4  television off and on. *Id.* at 51. She reported she "heat[ed] something up" for dinner for her and her
5  son each day and ate Hamburger Helper "consistently." *Id.* at 43, 51. She did not clean, but did
6  laundry every day, which she hung out on a clothesline. *Id.* at 51-52. Also, Plaintiff said she went
7  grocery shopping once or twice a week. *Id.* Plaintiff stated the only yard work she did was to mow
8  the lawn each week, but pulling the cord to start the gasoline mower exhausted her. *Id.* at 52-53.
9  She testified she is able to clothe and bathe herself. *Id.* at 54. According to Plaintiff, neither her
10 treating physician nor other doctors put limitations on activities she could perform, but Plaintiff
11 limited her own activities. *Id.* at 33, 56.
12      Plaintiff reported that "walking [was] an exertion" and "getting up off the couch can be . . .
13 very exerting." *Id.* at 29. Likewise, Plaintiff said activities such as "mopping the floor and
14 vacuuming" were too strenuous due to her shortness of breath. *Id.* at 35. Plaintiff testified she tried
15 to "stay down all day, because it isn't worth it" and that she had no energy. *Id.* at 35-36. Plaintiff
16 believed cigarette smoke, cleaning solvents such as Clorox, pollution, and smog affected her
17 breathing. *Id.* at 36.
18      Plaintiff stated she used to smoke but stopped when she was hospitalized and placed on
19 nicotine patches in 2002, 2004, or 2005. *Id.* at 34. However, the ALJ pointed out that in August
20 2007, Plaintiff admitted to smoking within the past two years on or around August 17, 2007. *Id.* at
21 34-35. Later, Plaintiff stated she presently smoked a "[a]bout a pack in two days" to deal with
22 depression and, which she attributed to her son's seizure disorder. *Id.* at 44.
23      Further, Plaintiff testified that she lost the bones in her gums and had no teeth as of August.
24 *Id.* at 56. As a result, Plaintiff reported that she wore dentures. *Id.*
25 C.   Third-Party Statement
26      Steven Forrest Garner, Plaintiff's husband, completed a third party "function report" on
27 March 17, 2006. AR at 162-69. Mr. Garner reported Plaintiff "struggles to cook our food and keep
28 us in clean clothes, but she still gets the job done." *Id.* at 162. He stated that Plaintiff cared for him

9

and their son by cooking and cleaning. *Id.* at 163. In addition, she took care of their dog. *Id.* According to Mr. Garner, Plaintiff's illness did not have an effect upon her ability to dress, feed or care for herself, but she had difficulty bathing because of trouble breathing in steam. *Id.* Plaintiff prepared meals daily, and Mr. Garner estimated it took her 35-45 minutes to do so. *Id.* at 164. He reported she was "less interested" in cooking since her illness began. *Id.* In addition, he reported she did not do house or yard work because of a "lack of air in her lungs." *Id.* at 165. Her daily activities included watching television and playing with their pet. *Id.* at 166.

Mr. Garner believed Plaintiff was "paranoid to go out anymore," and stated she went outside "perhaps 5 min[utes] a day." AR at 165, 168. Mr. Garner stated she would shop only two times a year, and did her shopping by phone for items such as kitchen utensils. *Id.* She did not have any social activities outside the home, but Mr. Garner reported there was no change in her social activities since the illness began. *Id.* at 166-67. Mr. Garner believed Plaintiff's "emphysema and its related lack of oxygen" affected Plaintiff's ability to lift, squat, bend, stand, reach, walk, kneel, and climb stairs. *Id.* at 167. He estimated Plaintiff could walk "up to 50 [feet]" before needing to rest for ten minutes. *Id.*

According to Mr. Garner, Plaintiff maintained the ability to pay bills, count change, and use checkbooks or money orders. *Id.* at 165. However, he believed that her emphysema affected Plaintiff's memory and concentration, ability to complete tasks, her understanding, ability to follow instructions and her getting along with others. *Id.* Mr. Garner reported Plaintiff had a "good" ability to follow written and oral instructions. *Id.* In addition, Mr. Garner believed Plaintiff's ability to handle stress was "good" and she could handle changes in routine "ok." *Id.* at 168.

D.   The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity from the alleged onset date of April 24, 2002, and met the insured status requirements through September 30, 2006. AR at 11. Second, the ALJ found Plaintiff has the following severe impairments: "obstructive airways disease and discoid lupus." *Id.* These impairments did not meet or medically equal one of the listed impairments, including the Listings 3.02, 8.05, or 14.02. *Id.* at 12.

The ALJ determined Plaintiff had the residual functional capacity ("RFC") "to lift and carry 20 pounds occasionally and 10 pounds frequently, and stand, walk and sit 6 hours in an 8-hour workday while avoiding concentrated exposure to fumes, dust, odors, and poor ventilation." AR at 12. With this RFC, the ALJ determined that Plaintiff was unable to perform past relevant work. *Id.* at 14. However, the ALJ found transferability of job skills was not material, because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled and there were jobs in significant numbers in the national economy that she could perform. *Id.* Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 15.

## DISCUSSION AND ANALYSIS

A.   The ALJ did not err in his consideration of the Listings at Step Three.

The listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original). At step three of the sequential evaluation, the claimant bears the burden of demonstrating that her impairments are the equivalent of listed impairment. *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987). 20 C.F.R. §§ 404.1520(d), 416.920(d). The Supreme Court explained, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. at 530 (emphasis in original). "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step." *Bowen*, 482 U.S. at 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

When an impairment, such as Plaintiff's, affects the skin "and has effects in other body systems," the Regulations specify evaluation "of the predominate feature [of] the impairment." *Id.* at Listing 8.00(D). For example, when a claimant suffers an autoimmune disorder or other immune system disorder such as systemic lupus erythematosus, the condition is first evaluated under the immune system disorder listings. *Id.* at Listing 8.00(D)(3). Specifically, lupus is evaluated under

11

Listing 14.02, which provides: "Systemic lupus erythematous (SLE) is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, malaise, involuntary weight loss)." *Id.* In addition, major organ or body system involvement can include: respiratory, cardiovascular, hematologic, skin, neurologic, mental, mood disorders, or immune system disorders. *Id.* at Listing 14.02(a). Notably, the ALJ considered Listing 14.02, and concluded Plaintiff's impairments did not meet or medically equal its requirements. AR at 12.

Nevertheless, according to Plaintiff, the ALJ erred in his assessment of her skin disorder, because "the evidence of record demonstrates that this severe impairment meets the criteria of 20 C.F.R. Part 404, Subpt. P, App. 1, Listing 8.02." (Doc. 13 at 8). Listing 8.02 specifies: "*Ichthyosis*, with extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P., App. 1. For all listings of skin disorders, the Regulations define "extensive skin lesions" as "those that involve multiple body sites or critical body areas, and result in a very serious limitation." *Id.* at Listing 8.00(C)(1). Examples include:

> a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.
>
> b. Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.
>
> c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

*Id.* at Listing 8.00(C)(1)(a)-(c). To establish an impairment medically equals a listing, symptoms, signs and laboratory findings must "at least equal in severity and duration . . . the characteristics of a relevant listed impairment." *Tackett*, 180 F.3d at 1099 (internal quotation marks and citation omitted). Thus, to establish her skin disorder medically equaled Listing 8.02[4], Plaintiff must show that she has "extensive skin lesions" on "critical body areas" such as those required by the Regulations. Notably, Plaintiff does not show her skin lesions affect

---

[4] Plaintiff must show her impairment is medically equals the criteria under Listing 8.02, because she admits that she does not have ichthyosis. (Doc. 13 at 8, n.3).

12

her joint motion, use of her palms, or ambulation similar to the lesions in Listing 8.02. Rather, Plaintiff focuses on the mental and emotional impact caused by her skin disease and lupus, which is incorporated in Listing 14.02. Therefore, Plaintiff's assertion that the ALJ should have considered equivalence under Listings 8.02 and 8.05 is unavailing, because she does not show her skin lesions result in any *physical* limitations such as those considered by the Listings. *See* 20 C.F.R. P. 404, Subpt. P, App. 1, Listings 8.00(C)(1).

B.  The ALJ set forth clear and convincing reasons for rejecting Plaintiff's credibility.

Plaintiff asserts the ALJ failed to make a proper credibility determination. (Doc. 13 at 10). In determining credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007), quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991). Here, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR at 13. However, the ALJ determined also that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible." *Id.*

An adverse finding of credibility must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ may not discredit a claimant's testimony as to the severity of symptoms only because it is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48. In addition, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Here, the ALJ considered Plaintiff's inconsistent statements, her daily activities, and the objective medical evidence. AR at 13-14.

*Inconsistent statements*

When determining whether a claimant is credible, an ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Here, the ALJ noted Plaintiff's inconsistent statements, including those made regarding smoking: "The claimant testified that she quit smoking cigarettes about two years ago, but then admitted that she started smoking again in [A]ugust 2007." AR at 12-13. Plaintiff's lack of candor was a valid consideration by the ALJ. *Smolen*, 80 F.3d at 1284; *Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989).

*Activities of daily living*

When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999), citing *Fair*, 885 F.2d at 603. For example, a claimant's ability to cook, clean, do laundry and manage finances is sufficient to support an adverse finding find of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend. She is able to manage her own finances…"). The Ninth Circuit found the ability to "take care of . . . personal needs, prepare easy meals, do light housework, and shop for some groceries . . . may be seen as inconsistent with the presence of a condition which would preclude all work activity." *Curry v. Sullivan*, 925 F.2d 1125, 1130 (9th Cir. 1990).

In this case, the ALJ considered Plaintiff's "wide-range" of daily activities as part of the credibility determination. Plaintiff reported that, in addition to watching television, she cared for her dogs, cooked simple and regular meals, did laundry and hung clothes on a line each day, went grocery shopping twice a week, mowed the backyard, and took care of her personal needs. AR at 13. These activities are comparable to those of claimants in *Curry* and *Burch*, and are inconsistent with claims of completely disabling impairments. Consequently, Plaintiff's activities of daily living were

clear and convincing evidence to discount her credibility.

*Objective medical evidence and treatment*

Generally, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit stated, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); SSR 96-7p, 1996 SSR LEXIS 4, at *2-3 (the ALJ "must consider the entire case record, including the objective medical evidence" in determining credibility, but statements "may not be disregarded solely because they are not substantiated by objective medical evidence").

Here, the ALJ did not base his decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff. Thus, the objective medical evidence was a relevant factor in determining Plaintiff's credibility, as was the treatment provided and used by Plaintiff. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (minimal treatment may suggest a lower level of pain and functional limitations than a claimant alleges); *see also Fair*, 885 F.2d at 603 (9th Cir. 1989). The ALJ summarized the medical findings regarding Plaintiff's shortness of breath, and noted Plaintiff was "not taking any medication and is smoking cigarettes again. The claimant testified that she no longer uses a nebulizer and uses her inhaler on an as needed basis." AR at 14. The fact that Plaintiff no longer required the use of a nebulizer and an inhaler assisted with her breathing problems was a valid consideration as part of the credibility determination. *See* SSR 96-7p, 1996 SSR LEXIS 4, at *21 (an ALJ may determine a claimant's statements are "less credible if the level or frequency of treatment is inconsistent with the level of complaints").

Given these considerations, the ALJ properly made "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

C.   The ALJ's failure to consider the lay witness testimony was a harmless error.

"Non-medical sources" including spouses, parents, and other relatives, may provide statements regarding the severity of a claimant's symptoms that the ALJ must consider. 20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work."). As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted). To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill*, 12 F.3d at 919. "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout*, 454 F.3d at 1056.

Here, the ALJ did not provide reasons for disregarding the testimony of Plaintiff's husband, Mr. Garner, who reported information regarding Plaintiff's daily activities and symptoms she exhibited as a result of her illness. Notably, Mr. Garner stated Plaintiff was much more limited than she herself opined. For example, Plaintiff reported she went grocery shopping about two times a week and mowed the lawn, but Mr. Garner reported she went shopping only twice a year and could only go outside for five minutes. *Compare* AR at 51-53 *with* AR at 51-53 165, 168. Because Mr. Garner did not provide new information, and seemed to limit Plaintiff's abilities more than she reported, the ALJ was not required to discuss Mr. Garner's statement. *See Ukolov v. Barnhart*, 420 F.3d 1002, 1006 n.6 (9th Cir. 2005) ("Because the testimony of the lay witness encompassed only symptoms, any failure of the ALJ to adequately address that testimony does not affect the outcome of the case."); *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (an ALJ need not discuss all

evidence present, and may ignore evidence that is not significant or probative).

Even considering Mr. Garner's testimony, this Court can confidently conclude no reasonable ALJ would have reached a different disability determination, because the ALJ's opinion remains supported by substantial evidence in the record.[5] Moreover, the opinion of a lay witness alone cannot provide the basis for a disability determination. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (requiring the opinion of an acceptable medical source to establish a medically determinable impairment). Therefore, the ALJ's failure to provide reason for disregarding Mr. Garner's testimony was a harmless error. *See Stout*, 454 F.3d at 1056.

## CONCLUSION

For all these reasons, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court. The ALJ did not err in his assessment at step three of the sequential evaluation, or in his adverse credibility determination. To the extent that the ALJ erred in not addressing the testimony of the lay witness, any error was harmless because the lay witness did not provide significant or probative testimony, and the ALJ's ultimate conclusion remained supported by substantial evidence.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is **DENIED**; and
2. The Clerk of Court IS DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Darlene Garner.

IT IS SO ORDERED.

Dated: **August 25, 2011**                                   /s/ Jennifer L. Thurston
                                                            UNITED STATES MAGISTRATE JUDGE

---

[5] The ALJ noted Dr. Nowlan opined Plaintiff "could lift and carry 30 pounds occasionally and 15 pounds frequently, and stand, walk and sit 8 hours." AR at 14, citing AR at 362. Also, as noted by the ALJ, Dr. Quint opined Plaintiff had the ability to perform light work. *Id.*, citing AR at 364-68. This assessment was affirmed by Dr. Koretzky. *Id.* Notably, the opinion of an examining physician may be substantial evidence where the examining physician "provides independent clinical findings," such as those provided by Dr. Nowlan after his physical examination of Plaintiff. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). Likewise, the opinions of Dr. Quint and Dr. Koretzky are substantial evidence because the opinions are consistent with the medical record. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). Further, Plaintiff does not challenge the ALJ's use of these opinions to determine her residual functional capacity.